## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-350 (CKK)** |
| **v.** | : | |
| | : | |
| **RUBEN REYNA,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Ruben Reyna to 14 days' incarceration and 12 months' probation. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.       Introduction

Reyna, a 33-year-old mechanical engineer, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Reyna pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of 14 days' incarceration and 12 months' probation is appropriate in this case because Reyna: (1) entered the Capitol Building by climbing through a broken window adjacent to the Senate Wing Door, mere minutes after the second violent breach at 2:47 p.m.; (2) celebrated the riots at the Capitol Building by taking photos and videos, including photos of himself smiling with other rioters, and posted them to his Facebook page; (3) denied responsibility in the days following the riot, instead placing blame on ANTIFA and the police; and (4) was not forthcoming with the FBI when they first interviewed him, denying entering the Capitol until he was shown an image of himself entering the Capitol building. Even though Reyna remained inside the Capitol building only for approximately one minute, "any participation in an insurrection, even if [the] participation was limited . . . mandates some punishment." *United States v. Anthony Griffith*, 21-cr-244 (CKK).

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, in light of the aggravating factors above, a sentence of probation only is not warranted. Instead, the facts and circumstances of Reyna's crime support a sentence of 14 days' incarceration and 12 months' probation.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the Capitol. *See* ECF 17 at ¶¶ 1–7.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Reyna's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, the defendant, Ruben Reyna, traveled from Detroit, Michigan to Washington, D.C. to attend the "Stop the Steal" rally planned for January 6, 2021. Reyna knew and understood from President Trump's remarks at the rally that Vice President Pence would be present at the Capitol that day. *See* ECF No. 17 at ¶¶ 8, 9.

After attending the rally, Reyna walked from the Ellipse to the grounds of the Capitol at around 1:00 p.m. with his friend, Eric Staples ("Staples").[2] Reyna and Staples approached the Capitol from the west and entered the area of the Capitol grounds known as the West Plaza. While on Capitol grounds, Reyna posed for multiple photographs, including "selfies" and photographs with other rioters, in which he held up four fingers to signify "four more years" of a Trump presidency. *See* ECF No. 17 at ¶¶ 10, 11.



*Image 1: Photo of Reyna Posing on Capitol Grounds, Posted to Reyna's Facebook Page*

---

[2] On December 21, 2023, Eric Staples was charged by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2) and 18 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). *United States v. Staples*, 24-cr-183 (RC), ECF No. 1. On April 24, 2024, Staples pled guilty, per a plea agreement, to one violation of 18 U.S.C. § 1752(a)(1). *Id.* at ECF No. 20. Staples is scheduled to be sentenced on September 23, 2024. *Id.* at ECF No. 19.

While on and near the West Plaza, Reyna saw plumes of tear gas billowing in the air and heard rioters loudly chanting. He also saw numerous law enforcement officers attempting to prevent the rioters from advancing on the Capitol. *See* ECF No. 17 at ¶ 12. Reyna later described the scenes as "chaotic" during a December 2022 interview with the Federal Bureau of Investigation ("FBI").

After rioters broke through police lines on the West Plaza and forced law enforcement to retreat, Reyna and Staples joined the mob in advancing on the Capitol, ultimately reaching the Capitol's Upper West Terrace. While on the Upper West Terrace, Reyna saw other rioters wearing body armor, helmets, and gas masks. *See* Ex. 2–3. Reyna later told the FBI that, as he approached the Capitol building, he felt that he was approaching a threshold that should not be crossed.



*Image 2: Screenshot from Exhibit 2 at 00:01 Seconds, with Rioters Wearing Body Armor, Helmets, and Gas Masks Circled in Red*

Reyna took photographs and videos of the crowd while on the Upper West Terrace, including one video that depicted Reyna joining other rioters in singing the national anthem. *See* Ex. 2.

4

At approximately 2:53 p.m., Reyna and Staples entered the Capitol building through a broken window next to the Senate Wing Door—where rioters breached a second time just six minutes earlier, after police had secured the area following the initial breach at 2:13 p.m. *See* Ex. 1. As he entered the building, Reyna could see shattered glass on the ground and could hear a high-pitched alarm sounding in the doorway. *See* ECF No. 17 at ¶ 16.



*Image 3: Screenshot from Exhibit 1 at 00:34, showing the Senate Wing Door being breached approximately six minutes before Reyna's entrance*



*Image 4: Screenshot from Exhibit 1 at 06:54, with Reyna Circled in Red*

While standing inside the broken window, Reyna took photographs of the interior of the Capitol building using his cellular phone. From his position inside the window, Reyna could see a line of law enforcement officers in riot gear attempting to contain the mob that had breached the Capitol. This line of officers is visible in a photograph Reyna posted to Facebook.



*Image 5: Photograph Posted to Reyna's Facebook Page, Showing the Vestibule Inside the Senate Wing Door and the Police Line with Backs Against the Wall*

Reyna remained inside the Capitol building for approximately one minute before exiting the building at 2:54 p.m. via the same broken window through which he entered. After exiting the Capitol building, Reyna and Staples remained on the Upper West Terrace for approximately ten minutes before leaving Capitol Grounds. *See* ECF No. 17 at ¶ 19–20.

*Reyna's Social Media Statements*

In the months leading up to January 6, 2021, Reyna posted to Facebook about his opinion that the 2020 presidential election had been stolen. Throughout November 2020, he shared allegations of "voter intimidation," "ppl voting with no ID," and "ballots being dropped off at 4am

after polls have closed, all for Biden." By December 2020, Reyna's message was simple: "Nothing is going to stop this Trump Train." And, later, "#FightForTrump."

On January 6, 2021, Reyna posed for numerous photographs and "selfies" on Capitol grounds. In these photographs, he is frequently seen holding up four fingers to signify "four more years" of a Trump presidency. After leaving the Capitol on January 6th, Reyna posted a number of these photographs, along with photographs of the Upper West Terrace and the Capitol Building's interior, to his Facebook with the caption: "#OurHouse #StopTheSteal".



*Image 6: Facebook Post by Reyna, Showing Various Photos Taken at the Capitol*

In the days following January 6, 2021, Reyna discussed the events of that day publicly and in private conversations via Facebook. On January 7th, he responded to Facebook comments about damage done to the Capitol, saying "we personally did not vandalize or damage anything. I cannot speak for the rest, who may have been ANTIFA undercover." By the following day, January 8, 2021, his commentary expanded beyond alleged ANTIFA misdeeds to include the actions of the

police. In one comment he stated, "seems like the police were also in on it. Plenty of videos show ANTIFA busting windows and a cop waving ppl through barricades." Later, Reyna commented on the broken windows and open door he encountered at the Capitol, describing the situation as "odd, like there were very suspicious ppl (possibly ANTIFA) taking advantage of our passion for entrapment."

Despite these deflections of responsibility, Reyna's private Facebook messages show that Reyna enjoyed the positive attention that he received for his participation in the riot. On January 7, 2021, someone messaged Reyna saying, "Thank you Rubin for representing us." Reyna responded, "It's an honor."

After learning that someone had reported him to the FBI for his activities on January 6th, Reyna did not accept responsibility for his actions. Rather, he disparaged the FBI's investigation. In private messages from January 23, 2021, and January 27, 2021, Reyna repeatedly referred to the FBI as "corrupt" while telling an acquaintance that he was "waiting for an interview with [the FBI's] corrupt ass." In the January 27, 2021, Facebook conversation, Reyna also falsely told his acquaintance that he "never went inside" the Capitol, refusing to admit the extent of his involvement in the riot.

*Reyna's Interview with the FBI*

On December 22, 2022, Reyna gave a voluntary interview to the FBI at his home. During the interview, he admitted to traveling from his home in Detroit, Michigan to Washington, D.C. on January 5, 2021. In D.C., Reyna met up with a friend and his friend's family, and the group attended the "Stop the Steal" rally together on January 6th. He admitted that, after the conclusion of President Trump' speech, he walked to the Capitol. Reyna told the FBI that when he arrived at

the Capitol, the scene was "chaotic" and that he observed people loudly chanting, tear gas in the air, and law enforcement face-to-face with rioters.

Reyna initially denied entering the Capitol Building on January 6, 2021. Then, only after an FBI agent showed Reyna a still image from Capitol CCTV footage depicting Reyna and Staples entering the Capitol Building through a broken window next to the Senate Wing Door, Reyna admitted to the FBI that he and Staples entered the Capitol Building.

<em>The Charges and Plea Agreement</em>

On October 4, 2023, the United States charged Reyna by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(d) and 5104(e)(2)(G). On January 12, 2024, pursuant to a plea agreement, Reyna pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Reyna now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

18 U.S.C. § 1752(a)(1)

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | −2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 32–42.

The U.S. Probation Office calculated Reyna's criminal history score as one. PSR at ¶ 45. Section 4C1.1 therefore does not apply in this case, and the U.S. Probation Office did not apply its Adjustment for Zero-Point Offenders. PSR at ¶ 41. Accordingly, the U.S. Probation Office calculated Reyna's total offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at zero months to six months. PSR at ¶ 67. Reyna's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days' incarceration and 12 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Reyna's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Reyna, the absence of violent or destructive acts is not a mitigating factor. Had Reyna engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Reyna's case is the timing and location of his entry into the Capitol Building. As seen in Exhibit 1, rioters began a coordinated effort to breach the Senate Wing Door around 2:47 p.m. The CCTV footage shows a group of rioters forming a column and pushing against the line of U.S. Capitol Police officers guarding the doorway. At approximately 2:49 p.m., this group breached the Senate Wing Door. A crowd of rioters then began streaming in through the door and surrounding windows. It was this chaotic scene that Reyna saw as he approached the Capitol Building. Sirens blared, shattered glass covered the ground, and the police had their backs against the wall. Confronted with these clear signs that the police were being overpowered by the mob, Reyna not only entered the Capitol Building (through a broken window,

no less) but also took a photograph of the scene, which he later posted to Facebook. The egregious circumstances of Reyna's entry into the Capitol Building demonstrate a significant disregard for the law and counsel in favor of a term of incarceration.

Additionally, the Court should consider Reyna's statements on social media in the days following January 6, 2021, coupled with his lack of remorse since then. As seen in Image 6, Reyna proudly posted photographs from his time at the Capitol with the caption: "#OurHouse #StopTheSteal". And then, in the following days, Reyna publicly deflected blame for the criminal activity that occurred on January 6th, blaming both ANTIFA and the police, while privately saying that it was an "honor" to be at the Capitol that day. Because of Reyna's history of self-serving public statements that downplay his culpability, the Court should be skeptical of any newfound expressions of remorse by Reyna at sentencing.

Accordingly, the nature and the circumstances of this offense establish the clear need for a short sentence of incarceration, coupled with probation, in this matter.

**B. Reyna's History and Characteristics**

As set forth in the PSR, Reyna's criminal history consists of a 2017 misdemeanor conviction for Operating [a Vehicle] Under the Influence of Alcohol/Liquor. PSR ¶ 44. For the past two years, Reyna has been employed by the Ford Motor Company in Dearborn, Michigan as an engineer in manufacturing. PSR ¶ 62. Reyna has been compliant with his conditions of pre-trial release and has reported that he is in good physical and mental health. PSR ¶¶ 56–57.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

12

*States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a short term of incarceration.

First, although Reyna accepted responsibility by stipulating to all of the facts underlying his guilt and resolving his case via a plea agreement, his post-January 6th statements are troubling.

Reyna has taken no steps to denounce his words and actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. PSR at ¶ 31. Rather, in the weeks following January 6, 2021, Reyna repeatedly blamed others for the day's events on others and cast doubt on the legitimacy of the government's prosecution of January 6th defendants.

The Court should therefore view any remorse Reyna expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Reyna's lack of remorse, and particularly his statements minimizing the gravity of the crimes committed on January 6, 2021, suggest that additional punishment is needed to deter Reyna specifically from future criminal activity.

The need for specific deterrence is especially strong here, where the exact conditions that drove Reyna's criminal conduct will be in effect. Reyna did not accept the results of the 2020 presidential election, so he traveled hundreds of miles from his home in Michigan to Washington, D.C. and then joined a mob in invading the Capitol and grinding Congressional proceedings to a halt. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6th looms ominously. The Court must sentence Reyna in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Reyna based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Reyna has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 180 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court and other judges in this district have sentenced Capitol breach defendants who, despite remaining inside the Capitol Building for a short period of time, entered the building at violent breach points, such as the Senate Wing Door. When a defendant's entry into the Capitol building immediately follows a violent breach, that places the defendant in a more serious category of offenders than defendants who entered the building through an area that was, if only momentarily, unguarded. A defendant, like Reyna, who witnesses violent efforts to breach the Capitol building and fight back the police and who then decides to follow the mob into the building displays a heightened disregard for the law.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Michael McCormick*, 21-cr-710 (TSC), the defendant pled guilty to a misdemeanor charge of 18 U.S.C. § 1752(a)(1) in connection with entering the Capitol building through the Senate Wing Door at approximately 2:55 p.m.—two minutes after Reyna—and remaining inside the building for approximately eight minutes. *See* 21-cr-710 (TSC), Dkt. No. 22. Similarly, in *United States v. Brandon & Stephanie Miller*, 21-cr-226 (TSC), the defendants entered the Capitol together through a window by the Senate Wing Door at approximately 2:56 p.m.  They paraded through the Crypt to the House Wing Door, turned around briefly, before turning again and exiting the Capitol through the Hall of Columns at approximately 3:07 p.m. During their time in the Capitol, one defendant broadcasted on Facebook Live and evidence from both defendants' phones showed they displayed pride in having gone inside the Capitol.  *See* 21-cr-266-TSC, Dkt. Nos. 49 and 50. Judge Chutkan sentenced the defendant in *McCormick* and one defendant in *Miller* to 14 days of incarceration.

Like McCormick and the Millers, Reyna entered the Capitol building in the area of the Senate Wing Door minutes after that area was violently breached. In fact, Reyna entered the building closer in time to the violent second breach of the Senate Wing Door. Reyna's Facebook activity in the days following January 6, 2021, likewise, mirrors the Millers' pride in having entered the Capitol, with Reyna telling an acquaintance that it was an "honor" to be there. And, unlike McCormick, Reyna did not enter the Capitol building through a door but, instead, climbed through a broken window.

While Reyna remained inside the Capitol building for a shorter period of time than McCormick or the Millers, this Court and others in the district have regularly sentenced January 6th defendants to periods of incarceration for similar amounts of time spent inside the building. Nicholas Hendrix received a sentence of 30 days' imprisonment, coupled with 36 months of

probation, after spending just 90 seconds inside the Capitol. *United States v. Nicholas Hendrix*, No. 21-cr-429 (CKK). Because *Hendrix* involved additional aggravating factors, such as a second attempt to enter the Capitol Building, a shorter period of incarceration is appropriate in this case.

The government acknowledges that this Court previously sentenced Deborah Sandoval to five months' incarceration for one count of violating 18 U.S.C. § 1752(a)(1). *United States v. Deborah Sandoval*, 21-cr-195 (CKK). Although *Sandoval* involved the same offense of conviction as here, a number of aggravating factors existed in *Sandoval* that do not apply to Reyna. For example, Sandoval encouraged others to bring weapons to Washington D.C. and ultimately remained inside the Capitol building for nearly 25 minutes. Sandoval additionally deleted evidence of her own crimes and encouraged other rioters to do the same. In comparison, Reyna remained inside the Capitol building for a short period of time and did not use especially violent rhetoric to prepare for or describe the events of January 6, 2021. Therefore, a lengthier period of incarceration is not justified in this case, notwithstanding the Court's previous sentence in *Sandoval*.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court

might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Reyna must pay $500 in restitution, which reflects in part the role Reyna played in the riot on January 6.[5] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05 in damages," a

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Reyna's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 83.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Reyna to 14 days' incarceration and 12 months' probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Reyna's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Sean J. Brennan*
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
sean.brennan@usdoj.gov
(202) 252-7125